# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

COVENANT LIFE INTERNATIONAL,  )
INC.                          )
                              )
    *Plaintiff*,          )    Case No. 3:23-cv-334
                              )
v.                            )    Judge Atchley
                              )
CITY OF NORRIS, TENNESSEE, *et al.*,  )    Magistrate Judge McCook
                              )
    *Defendants*.         )
                              )

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Counter-Plaintiff City of Norris, Tennessee's ("Norris") Motion for Preliminary Injunction and Motion for Summary Judgment. [Doc. 17]. Alleging numerous zoning and municipal ordinance violations, Norris seeks to enjoin Counter-Defendant Covenant Life International, Inc. ("Covenant Life") from continuing the current use of its property. Norris also requests summary judgment on its counterclaim for a declaratory judgment. For the reasons explained below, Norris's motion will be **GRANTED IN PART** and **DENIED IN PART**.

## I.    FACTUAL BACKGROUND

Covenant Life operates a church in Norris, Tennessee, on property it purchased in 2003. The property is zoned in Norris's P-1 District, which permits churches and other specified uses. [Doc. 18-4 at 50; Doc. 18-16 at 2]. In 2019, Covenant Life created what it refers to as the "Solid Rock Retreat." [Doc. 27 at 5]. The Retreat consists of sixteen parking spaces where guests can park their campers and recreational vehicles for overnight stays. [Doc. 27-1 at ¶ 20–21]. Initially, the Retreat also included a bathhouse for guests, but Covenant Life later demolished the structure after a stop work order alleged a lack of proper permitting. [*Id.* at ¶ 39; Doc. 19 at 7–8].

In addition to providing places to park, the Retreat offers electrical and water service hookups to guests. [Doc. 27 at 5; Doc. 30 at ¶ 2]. These resources attract a steady supply of guests, but the Retreat is not open to the public at large. [Doc. 27-1 at ¶ 27]. Instead, Covenant Life vets potential guests, and those who are permitted to stay are not charged any rental fees. [*Id.* at ¶ 26]. Guests may, however, offer donations to support the Retreat if they so choose. [*Id.* at ¶ 28]. Covenant Life alleges that the Retreat operated without any issues until 2022. [Doc. 27 at 7].

Though the parties disagree as to whether permits were necessary, it is undisputed that Covenant Life did not obtain separate building, plumbing, electrical, or grading permits from Norris for the Retreat. Norris Building Inspector Lisa Crumpley, taking issue with the lack of separate permitting, issued a stop work order on July 28, 2022. [Doc. 18-6]. The order identified the lack of a site plan, construction plans, and grading permits. [*Id.*]. Following the order's issuance, discussions commenced between Covenant Life representatives and Norris Planning Commission officials. [Doc. 19 at 6–7; Doc. 27 at 7–8]. Norris officials informed Covenant Life representatives that they would need to apply for rezoning and obtain the required permits. [Doc. 19 at 6–7]. Covenant Life disagreed with Norris's directives and maintained that neither rezoning nor permitting was required. [Doc. 27 at 7–8].

Fast forward to April 17, 2023. On that day, Building Inspector Crumpley inspected the church property and later issued two additional stop work orders on May 3, 2023. The first alleged violations of Sections 105 and 112 of the International Building Code, which Norris has adopted as part of its municipal code. [Doc. 18-9]. Specifically, the stop work order alleged that Covenant Life improperly installed, altered, or enlarged a plumbing system without a permit and improperly connected a service utility without a permit. [*Id.*]. Covenant Life admits that one of its contractors connected an underground line to run water from the church to the then-existing bathhouse. [Doc.

2

27 at 9]. Covenant Life later disconnected and capped the water line, and Building Inspector Crumpley released the stop work order on June 29, 2023. [*Id.*; Doc. 18-13].

The story with this stop work order does not end there, however. With the underground water line no longer in operation, Covenant Life needed to find another way to supply water to the Retreat. Covenant Life first used a well on its property as a substitute, but after learning of its contamination, Covenant Life shifted to using a spigot connected to the church building. [Doc. 27 at 10; Doc. 27-1 at ¶ 40–42]. Covenant Life connected a garden hose to the spigot and ran the hose to the Retreat to provide guests with water. [*Id.*]. Upon learning of this arrangement, Building Inspector Crumpley notified Covenant Life that its water service may be terminated if it did not stop using the spigot to supply water to the Retreat, in direct circumvention of the recently rescinded stop work order. [Doc. 19 at 9; Doc. 27 at 10]. This communication prompted Covenant Life to file this lawsuit in state court. [Doc. 27 at 11].

Meanwhile, the second stop work order from May 3, 2023, invoked Sections 105, 111, 114, and 115 of the International Building Code. [Doc. 18-10]. It alleged that Covenant Life improperly constructed a building or structure without a permit and was using and occupying a building or structure without the required certificate of occupancy. [*Id.*]. The stop work order commanded Covenant Life to cease its use and occupancy of the Retreat. [*Id.*]. Covenant Life claims it learned that the stop work order pertained to the bathhouse. [Doc. 27-1 at ¶ 39]. Subsequently, volunteers at Covenant Life demolished the bathhouse and removed it from the property. [*Id.*]. This stop work order, along with the initial July 28, 2022, stop work order, both remain in place, however. [Doc. 19 at 9].

Covenant Life filed suit in the Anderson County Chancery Court and asserted claims against Norris for declaratory and injunctive relief. [Doc. 1-1]. Norris removed the case to this

Court and raised a counterclaim for declaratory judgment. [Doc. 8]. After filing its answer and counterclaim, Norris moved for a preliminary injunction and for summary judgment on its counterclaim. [Doc. 17]. That motion is now ripe for the Court's review.

## II.    STANDARD OF REVIEW

Norris moves jointly for a preliminary injunction and for summary judgment. The standards governing these two motions are well-settled. In determining a movant's entitlement to a preliminary injunction, a district court must consider four factors, which include "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 627 (6th Cir. 2013) (quoting *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004)). Meanwhile, "[s]ummary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Sommer v. Davis*, 317 F.3d 686, 690 (6th Cir. 2003) (citing Fed. R. Civ. P. 56(c)). When ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III.    ANALYSIS

Norris's counterclaim for a declaratory judgment asks the Court to make several findings. Each finding, if made, would deem Covenant Life in violation of various zoning regulations and

municipal code provisions. Norris's declaratory judgment counterclaim overlaps entirely with its request for a preliminary injunction. [Doc. 19 at 19]. Accordingly, the Court will first assess the merits of the declaratory judgment counterclaim before determining whether Norris is entitled to a preliminary injunction.

## A. The Court's Jurisdiction

Before considering the merits of Norris's counterclaim, the Court must first determine whether it should exercise jurisdiction.[1] District courts enjoy substantial discretion in determining whether they should exercise jurisdiction over a declaratory judgment claim. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). Five factors guide the exercise of discretion. They include "(1) whether the declaratory action would settle the controversy"; "(2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue"; "(3) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing'"; "(4) whether the use of a declaratory action would increase friction between our state and federal courts"; and "(5) whether there is an alternative remedy which is better or more effective." *Cardinal Health, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 29 F.4th 792, 796–97 (6th Cir. 2022) (quoting *Grand Turk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)). No one factor is inherently more important than the others, and the weight each factor holds will depend on the facts of the case. *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014).

Turning to the factors, the Court begins with the first two: whether the declaratory judgment claim would settle the controversy and clarify the parties' legal relations. These factors are intertwined and often considered together. *Boyd v. Martinez*, No. 22-6026, 2023 WL 4903173,

---

[1] Neither Norris nor Covenant Life contends that the Court should decline to entertain the declaratory judgment counterclaim. Nonetheless, the Court is still obligated to determine whether it should exercise jurisdiction. *W. Bend Mut. Ins. Co. v. Healy Homes, LLC*, No. 3:20-cv-3, 2021 WL 5283070, at *3 (E.D. Tenn. Aug. 5, 2021) (citation omitted).

at *5 (6th Cir. Aug. 1, 2023). Covenant Life asserts due process and declaratory judgment claims not presently before the Court, so Norris's declaratory judgment counterclaim may not fully settle the controversy. Ruling on Norris's counterclaim, however, would substantially clarify the parties' legal relations. A central dispute in this matter concerns whether Covenant Life is violating Norris's ordinances, and Norris's counterclaim seeks to resolve this dispute by requesting a declaration that Covenant Life is in fact violating numerous ordinances. When considered together, the first factor is best described as neutral while the second factor firmly supports the exercise of jurisdiction.

The third factor—whether the declaratory judgment claim is asserted for purposes of "procedural fencing"—is not particularly relevant here. Procedural fencing is akin to forum shopping and often occurs "where the declaratory-judgment plaintiff filed its suit in apparent anticipation of litigation in state court." *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 399 (6th Cir. 2019) (citing *AmSouth Bank v. Dale*, 386 F.3d 763, 788–90 (6th Cir. 2004)). This situation typically arises in insurance coverage disputes, where related litigation is likely to proceed in state court, but a party files a federal declaratory judgment action first in an attempt to obtain a more favorable forum. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 558 (6th Cir. 2008). In that situation, the district court can decline to exercise jurisdiction as a way to avoid rewarding "procedural games." *Hoey*, 773 F.3d at 761.

This is not a case where Norris filed its declaratory judgment claim in anticipation of state court litigation. Instead, Norris asserted its claim after removing Covenant Life's suit from state court, and there is no other ongoing or anticipated state court litigation. Considering this procedural posture, along with an absence of evidence in the record suggesting procedural fencing, this factor is neutral. *Banks Eng'g, Inc. v. Nationwide Mut. Ins. Co.*, No. 21-5652, 2022 WL 203332, at *4

6

(6th Cir. Jan. 24, 2022) (finding factor neutral where party removed case to federal court and there was no evidence of procedural fencing in the record).

The fourth factor addresses concerns of federalism and considers whether the federal declaratory judgment action would intrude on the state courts' jurisdiction. *Cardinal Health*, 29 F.4th at 796–97, 798 (citing *Flowers*, 513 F.3d at 559). Three sub-factors come into play when assessing this factor. They include "(1) whether the underlying factual issues are important to an informed resolution of the case"; (2) whether the state trial court is in a better position to evaluate those factual issues than is the federal court"; and "(3) whether there is a close nexus between underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action." *Id.* at 798–99 (quoting *Flowers*, 513 F.3d at 560). The Court will consider each of these sub-factors below.

The first sub-factor "points against exercising jurisdiction when 'resolution of the issue raised in federal court will require making factual findings that might conflict with similar findings made by the state court." *Id.* at 799 (quoting *Flowers*, 513 F.3d at 560). There is not any pending state court litigation between these parties, so no factual findings the Court makes will conflict with any state court. Moreover, the Court is not aware of any cases pending in Tennessee state courts that involve the issues underlying this declaratory judgment action—namely, the interpretation of Norris's municipal ordinances. *Cf. id.* at 799 (finding that sub-factor could weigh against exercising jurisdiction where state courts were simultaneously interpreting the same insurance policy provisions at issue in the federal declaratory judgment action). This sub-factor is either neutral or supports the exercise of jurisdiction. *Boyd*, 2023 WL 4903173, at *6 (finding that sub-factor supported exercise of jurisdiction because the factual issues in the pending state court action were irrelevant to the issue underlying the federal declaratory judgment action).

The second sub-factor views state courts as better equipped "to evaluate novel questions of state law." *Cardinal Health*, 29 F.4th at 799 (quoting *Flowers*, 513 F.3d at 560). Jurisdiction will be disfavored where the federal declaratory judgment action concerns "an area of actively developing state law." *Id.* That is not the case here. This case involves the interpretation of Norris's municipal ordinances, and a long line of Tennessee cases provide rules as to how such ordinances should be construed. Resolution of Norris's declaratory judgment counterclaim simply requires the Court to apply those well-established rules. *Boyd*, 2023 WL 4903173, at *7 (holding that sub-factor favored exercise of jurisdiction because the case "involves an ordinary application of state contract law principles and involves no novel question of state law"). Considering the issues involved here, this sub-factor supports the exercise of jurisdiction.

The third and final sub-factor considers whether state or federal law predominates in the declaratory judgment action. Where the declaratory judgment claim can be resolved solely through application of state law, this sub-factor will weigh against the exercise of jurisdiction. *Id.* (citing *Flowers*, 513 F.3d 546, 561). The interpretation of Norris's municipal ordinances requires the Court to look to state law, so this sub-factor does tend to counsel against exercising jurisdiction. Notwithstanding this conclusion, the fourth factor as a whole weighs slightly in favor of exercising jurisdiction. This is so because the Court deemed the first sub-factor as neutral or slightly supportive of jurisdiction, the second as supportive, and the third as opposed to exercising jurisdiction.

The fifth factor, and the last one the Court must address, considers whether a better remedy exists as compared to the federal declaratory relief sought. *Cardinal Health*, 29 F.4th at 801. The Sixth Circuit has deemed the availability of state law declaratory relief to be a better alternative remedy in some cases. *Cole's Place*, 936 F.3d at 401. Even where the state declaratory judgment

law would afford the same relief as a federal declaratory judgment claim, "the state remedy has the advantage of allowing the state court to apply its own law." *Id.* Norris could have pursued its declaratory judgment claim in state court. Given the available state-court alternative, this factor arguably cuts against exercising jurisdiction. *Id.* at 401–02 (finding that factor "arguably disfavors the exercise of jurisdiction" where the plaintiff could have sought a declaratory judgment under state law and in state court).

After considering all factors, the Court concludes that it should exercise jurisdiction and address Norris's declaratory judgment claim on the merits. The second and fourth factors support the exercise of jurisdiction, the first and third are neutral, and only the fifth factor weighs against the Court asserting jurisdiction. This combination renders it appropriate for the Court to exercise jurisdiction, and worth noting again, neither party contends that the Court should not resolve the declaratory judgment counterclaim. *Id.* at 402 (finding that district court did not abuse discretion in exercising jurisdiction where two factors supported jurisdiction, two were neutral, and one counseled against exercising jurisdiction).

## B. Norris's Declaratory Judgment Counterclaim

Having deemed it appropriate to exercise jurisdiction, the Court now turns to the merits of Norris's counterclaim. Norris's declaratory judgment counterclaim asks the Court to make four findings. These include findings that (1) Covenant Life's use of its property is inconsistent with the zoning ordinance; (2) Covenant Life began using the property without a certificate of occupancy; (3) Covenant Life made improvements without a site plan or the required building, grading, electrical, or plumbing permits; and (4) Covenant Life violated code provisions and circumvented a stop work order through its use of a spigot to supply water to the Retreat. [Doc. 8 at ¶ 33]. The Court will consider each requested finding separately.

9

## 1. Permissibility Under the Zoning Ordinance

Norris first asks the Court to conclude that the Retreat is not a permitted use within the applicable zoning district. The Retreat is zoned P-1, which is Norris's Professional and Civic District. [Doc. 18-4 at 50]. Norris contends that nothing resembling the Retreat is listed among the district's permitted uses. Meanwhile, Covenant Life asserts that the Retreat is a permitted use, either as an extension of the church itself or as parking. The Court finds that the Retreat is not permitted in the P-1 district, but Norris is nonetheless not entitled to summary judgment because a question remains as to whether the zoning ordinance unlawfully bans uses like the Retreat.

Norris's initial argument is one of statutory construction. It essentially relies on the doctrine of *expressio unius est exclusio alterius*, which means that the expression of one thing implies the exclusion of others. *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1357 (6th Cir. 1995). Norris's argument is straightforward: the P-1 District lists its permitted uses, nothing like the Retreat is included among those uses, and other districts permit similar recreational uses, which means that per *expressio unius est exclusio alterius*, drafters deliberately chose to exclude uses like the Retreat from the P-1 District. [Doc. 19 at 5, 14].

Norris's P-1 District, as defined in Code Section § 14-313, enumerates nine permitted uses. [Doc. 18-4 at 50–51]. These permitted uses include single and multi-family dwellings, churches and places of worship, professional and governmental business offices, educational facilities, places for public assembly, postal services, hotels and motels on designated arterial streets, cultural centers, and short-term rentals as defined by Ordinance #634. [*Id.*].[2] None of these permitted uses,

---

[2] At first blush, the Retreat may seem to fit within the definition of "short-term rental." Norris argues that the Retreat does not fit within this category, however, because the ordinance designates short-term rentals as pertaining to the rental of a "residential dwelling unit." [Doc. 19 at 5 n.3]. The ordinance defining "short-term rental" supports Norris's characterization. [Doc. 18-5 at 8]. In any event, Covenant Life never argues that the Retreat qualifies as a short-term rental under the ordinance.

according to Norris, encompasses anything like the Retreat. Moreover, Norris emphasizes that the C-2 District permits "[c]ommercial recreation uses" and the FAR District permits "[r]ecreational uses for the public sector," which suggests that a similar recreational use like the Retreat is not permitted in the P-1 District. [*Id.* at 17, 27].

The Court cannot accept this aspect of Norris's argument. For the Court to place any emphasis on the C-2 District allowing "commercial recreation uses" or the FAR District allowing "recreational uses for the public sector," Norris necessarily must show that the Retreat qualifies as one of these things. Norris cannot make this showing. The zoning ordinance does not define "commercial recreation uses" or "recreational uses for the public sector." When a zoning ordinance fails to define a term, courts must assign the term its ordinary meaning. *Reed v. Town of Louisville*, No. E2023-00438-COA-R3-CV, 2024 WL 694168, at *5 (Tenn. Ct. App. Feb. 20, 2024) (citing *Whittemore v. Brentwood Plan. Comm'n*, 835 S.W.2d 11, 15 (Tenn. Ct. App. 1992)).

Regarding "commercial recreation uses," the term "commercial" usually connotes some level of profit generation. *See, e.g.*, *Commercial Use*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "commercial use" as a "use that is connected with or furthers an ongoing profit-making activity). Covenant Life admits that it charged rental fees to guests of the Retreat at the beginning of its operation. [Doc. 18-17 at 11; Doc. 19 at 10]. Tony McAfee, Covenant Life's Senior Pastor, avers, however, that Retreat guests are no longer charged any rental fees. [Doc. 27-1 at ¶ 26]. Instead, guests may support the Retreat with voluntary donations. [*Id.* at ¶ 28]. Norris does not rebut McAfee's averments with evidence of its own. Accordingly, Norris has not demonstrated as a matter of law that the Retreat is a "commercial recreational use."

The result is the same as to the "recreational uses for the public sector" allowed in the FAR District. Turning again to an ordinary meaning analysis, the term "public sector" implicates

11

government involvement. *See, e.g.*, *Public Sector*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "public sector" as the "part of the economy or an industry that is owned and controlled by the government"). Covenant Life, not any governmental entity, owns and operates the Retreat. Relatedly, McAfee avers that the Retreat is not open to the general public, and all guests undergo screening before being allowed to stay. [Doc. 27-1 at ¶ 27]. Norris does not offer any evidence to refute these assertions, which means that it cannot prove as a matter of law that the Retreat qualifies as a "recreational use for the public sector."[3]

Even if Norris has failed to sufficiently prove that the Retreat is a "commercial recreational use" or "recreational use for the public sector," the failure does not automatically render the Retreat a permitted use in the P-1 District. Section 14-601 of Norris's ordinance provides that "no structure or land shall . . . be used . . . unless in conformity with the regulations herein specified for the district in which it is located." [Doc. 18-4 at 111]. Per this language, all uses within a zoning district are prohibited unless expressly permitted. The Retreat is not a single or multi-family dwelling, church, office, educational facility, place for public assembly, post office, hotel, cultural center, or short-term rental. Those are the only uses the P-1 District lists as permitted. Because the Retreat does not fit into any of P-1's permitted uses, it is a prohibited use.

Though not binding authority, a decision of the Ohio Court of Appeals proves instructive on this point. *State ex rel. Bailey v. Madison*, No. 12AP-284, 2012 WL 5266320 (Ohio Ct. App. Oct. 25, 2012). There, the court confronted a zoning ordinance that prohibited all uses not

---

[3] Though Norris's ordinance does not explicitly define "recreational uses for the public sector," it does shed some light on the term's potential meaning when listing permitted uses in the W-1 District. [Doc. 18-4 at 49]. There, the ordinance explains that among the permitted uses in W-1 are "[r]ecreational uses of a *public nature*, including, but not limited to, hiking, horseback riding, and bicycling." [*Id.* (emphasis added)]. If one assumes that "recreational uses for the public *sector*" and "recreational uses of a public *nature*" are meant to have similar meanings, the language describing the latter term would further undermine Norris's argument that the Retreat is a "recreational use for the public sector." This is because there is no evidence in the record to suggest that the Retreat offers activities such as hiking, horseback riding, or bicycling.

specifically listed as permitted. *Id.* at *3. The property owner argued that she could park commercial vehicles on her land because the zoning district did not specifically prohibit such activity. *Id.* Rejecting that argument, the Ohio Court of Appeals emphasized that the zoning ordinance prohibited all uses not expressly permitted. *Id.* Because of this design, the zoning ordinance "did not need to specifically prohibit the parking and storage of commercial vehicles" to render it prohibited. *Id.* The same holds true here. Norris's P-1 District prohibits the uses it does not permit, so Norris did not need to specifically prohibit uses like the Retreat to render them prohibited in the P-1 District.

Covenant Life makes three arguments to support its view that the Retreat is a permitted use in the P-1 District. First, Covenant Life characterizes the Retreat as an outreach of the church and its mission. [Doc. 27 at 14]. This argument cannot prevail. Covenant Life emphasizes the well-established rule that zoning ordinances must be strictly construed in the property owner's favor. *Boles v. City of Chattanooga*, 892 S.W.2d 416, 420 (Tenn. Ct. App. 1994) (quoting *State v. City of Oak Hill*, 321 S.W.2d 557, 559 (Tenn. 1959)). Strict construction is the rule, but it does not permit courts to distort a zoning ordinance's meaning simply because doing so benefits the property owner. Indeed, a zoning ordinance is only subjected "to as strict a construction as will still allow the legislation to have its intended effect." *Id.*

Covenant Life's position, which would deem the Retreat a permitted use in P-1 as part of the church, undermines the zoning ordinance's intended effect. That the Retreat may further the church's mission does not render it a permitted use. Pursuant to Covenant Life's position, the church could presumably add just about anything to its property so long as the addition enjoys some connection to the church's overarching mission. Covenant Life claims that the Retreat allows it to spread the church's teachings and attract new members, but these same goals could be

13

accomplished with an amusement park, restaurant, or any other use of land that facilitates interactions with the public. The Retreat itself is quite clearly not a church, and Covenant Life cannot group the Retreat into P-1's list of permitted uses simply by claiming that it is an extension of the church. This interpretation would seriously stretch the meaning of "church" and compromise the aims of Norris's zoning ordinance.[4]

Covenant Life's second argument to justify the Retreat as a permitted use in P-1 hinges on the ordinance's parking provisions. Norris's P-1 District permits off-street parking as regulated in Section 14-405. [Doc. 18-4 at 51]. That section establishes requirements for parking, such as the minimum number of spaces and design specifications. [*Id.* at 69–71]. According to Covenant Life, because Section 14-405 does not place limits on the types of vehicles that may be parked or on how long a vehicle may be parked, the Retreat qualifies as permissible parking. [Doc. 27 at 22]. Any interpretation that forbids the Retreat's parking arrangement, Covenant Life argues, violates the rule of strict construction and imposes a use limitation when one is not present in the ordinance's language. [*Id.*].

The Court can understand why Covenant Life invokes the rule of strict construction. Again, however, that rule does not allow the Court to adopt interpretations that will undermine the ordinance's intended effect. *Boles*, 892 S.W.2d at 420. Relatedly, when dealing with a clear ordinance, courts should avoid "a forced interpretation that would limit or expand the statute's application." *Northshore Corridor Ass'n v. Knox Cnty.*, 633 S.W.3d 561, 579 (Tenn. Ct. App. 2021). Covenant Life's proffered interpretation would do precisely that and expand the ordinance's

---

[4] To the extent Covenant Life would characterize the Retreat as an accessory use to the church, that argument also fails. Norris's zoning ordinance defines accessory uses as those uses "customarily incidental, appropriate, and subordinate to the principal use of land or buildings and located upon the same lot therewith." [Doc. 18-4 at 9]. A detached garage, for example, would be an accessory use to a single-family home. *See Waste Connection of Tenn. v. Metro. Gov't of Nashville & Davidson Cnty.*, No. M2012-02290-COA-R3-CV, 2013 WL 1282011, at *3 n.2 (Tenn. Ct. App. Mar. 27, 2013) (citation omitted). By contrast, a site that offers parking slips and utility hookups to recreational vehicles is not a use customarily incidental to a church.

14

definition and application of parking beyond recognition. The off-street parking provision Covenant Life invokes applies to *all* zoning districts. [*See* Doc. 18-4 at 5]. That is, every zoning district, including the Retreat's P-1 District, is subject to the same parking regulations set forth in Section 14-405. Logically, then, Covenant Life's interpretation means that sites like the Retreat would be permitted in every district pursuant to the ordinance's off-street parking provision. A single-family homeowner in the R-1 Low Density Residential District, subject to the same parking regulations as the Retreat, could presumably add RV parking slips in the backyard along with utility hookups. Such an arrangement, permitted under Covenant Life's interpretation of Section 14-405, would frustrate the R-1 District's goals of promoting order, efficiency, and "adequate light, air, and open space for dwellings." [Doc. 18-4 at 18]. This same result would follow throughout other zoning districts, which is why Covenant Life's interpretation of the off-street parking provision cannot stand.[5]

Covenant Life's final argument in defense of the Retreat contends that Norris's ordinance cannot be interpreted to totally exclude it as a permissible use. [Doc. 34 at 3]. If the Retreat is not viewed as part of the church or as parking, Covenant Life suggests that the ordinance would be impermissibly excluding a lawful use like the Retreat. Covenant Life cites to *Robertson County, Tennessee v. Browning-Ferris Industries of Tennessee, Inc.*, 799 S.W.2d 662 (Tenn. Ct. App. 1990), in support of this proposition. *Robertson County* saw the property owner allege that the municipality's zoning ordinance totally excluded sanitary landfills, "even as a special use, variance, or on appeal." *Id.* at 664. The municipality admitted that its zoning ordinance did not

---

[5] Apart from the overbroad application, Covenant Life's reliance on the off-street parking provision is also flawed because the Retreat can hardly be characterized as mere parking. Notwithstanding Covenant Life's argument that Section 14-405 places no limits on what can be parked or for how long, parking, as it is traditionally understood, does not include overnight stays and spaces equipped with utility hookups. The Retreat does not fit within the category of off-street parking.

15

permit any sanitary landfills. *Id.* On these facts, the Tennessee Court of Appeals deemed invalid the ordinance's total exclusion of sanitary landfills. *Id.* at 666. The court noted that an ordinance's presumption of validity is overcome upon its total exclusion of a lawful business. *Id.*

This argument will spare Covenant Life from summary judgment. On this record, the Court cannot definitively say whether Norris's zoning ordinance totally bans uses like the Retreat or not. To refute the suggestion of a total ban, Norris points out that Covenant Life can apply for rezoning to render the Retreat permitted. [Doc. 8 at ¶ 15; Doc. 35 at 2]. Other nearby camping facilities, such as the Museum of Appalachia, have proceeded through the rezoning process to have their uses approved. [*Id.*]. The existence of a camping facility, rendered permissible after rezoning, could indicate that uses like the Retreat are not completely excluded in Norris. *See Consol. Waste Sys., LLC v. Metro Gov't of Nashville & Davidson Cnty.*, No. M2002-02582-COA-R3-CV, 2005 WL 1541860, at *40 (Tenn. Ct. App. 2005) (explaining that the existence of landfills elsewhere in the county, in part, distinguishes the case from *Robertson County* and suggests that the ordinance at issue did not totally ban landfills). But the Court does not have any information about the particulars of the Museum of Appalachia facility, beyond the fact that it applied for and was granted rezoning. The Court does not know, for example, how the Museum of Appalachia operates or whether it offers guests utility hookups. Without this information, the Court cannot decide whether uses like the Retreat exist elsewhere in Norris. If the Museum of Appalachia is materially different from the Retreat, then its successful rezoning effort would do little to dispel concerns that the ordinance totally bans a lawful use like the Retreat.

To be clear, the Court did conclude that the Retreat is not a permitted use in the P-1 District based on the zoning ordinance's language. Notwithstanding that conclusion, the Court cannot grant summary judgment in favor of Norris on its claim when there is an unresolved question as to

16

whether the zoning ordinance impermissibly excludes a lawful land use like the Retreat. Norris is therefore not entitled to summary judgment on its claim that the Retreat is a prohibited use in the P-1 District.

### 2. Certificate of Occupancy

Norris's second claim alleges that Covenant Life needed a certificate of occupancy before using the Retreat. The parties' arguments are similar to the ones they made for the above-discussed zoning district claim. Norris contends that the Retreat constitutes a distinct use from the church, which renders a certificate of occupancy required. Covenant Life, on the other hand, again invokes the rule of strict construction and argues that a certificate of occupancy is not required when that rule is applied correctly. For the reasons discussed below, Norris is entitled to summary judgment on its claim that Covenant Life is using the Retreat, but not the bathhouse, without a certificate of occupancy.

The certificate of occupancy claim must be analyzed in two parts, first as to the bathhouse and second as to the rest of the Retreat. Regarding the bathhouse, Covenant Life argues that any such claim is moot because the church destroyed the bathhouse and because McAfee avers that it will not be rebuilt without the necessary permits. [Doc. 27 at 18, 20]. Norris counters that the bathhouse's demolition should not result in mootness because Covenant Life did so without obtaining the necessary demolition permit. [Doc. 29 at 11]. Moreover, Norris insists that McAfee's bare declaration fails to moot its claim. [*Id.* at 12].

A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)). Mootness does not ordinarily result, however, from a party's voluntary cessation of its challenged conduct. *Resurrection Sch. v. Hertel*,

35 F.4th 524, 528–29 (6th Cir. 2022) (quoting *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019)). Voluntary cessation "moots a case only if there clearly is 'no reasonable expectation that the alleged violation will recur.'" *Id.* The burden to prove mootness through voluntary cessation is a heavy one, and the burden "lies with the party asserting mootness." *McKee Foods Corp. v. BFP, Inc.*, No. 23-, 2024 WL 1213808, at *5 (6th Cir. Mar. 21, 2024) (quoting *Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

Though a close call, Norris's certificate of occupancy claim as to the bathhouse is moot. The timing of a party's voluntary cessation plays an important role in the mootness inquiry. *See id.* at *6. Cessations that occur further away from the start of the litigation and for reasons unrelated to the litigation are inherently less suspicious. *Id.* Here, the record does not reveal exactly when Covenant Life demolished the bathhouse, but it evidently did so after learning that one of the stop work orders pertained to the bathhouse. [Doc. 27 at 10]. The timing of Covenant Life's cessation, to be sure, does cast some suspicion on its genuineness. But the bathhouse's demolition ultimately convinces the Court that Covenant Life is reasonably unlikely to rebuild it without obtaining the necessary permits.

"Ultimately, the 'test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties.'" *Sullivan v. Benningfield*, 920 F.3d 401, 410 (6th Cir. 2019) (quoting *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 458 (6th Cir. 1997)). It is difficult to see how the Court issuing a declaratory judgment finding Covenant Life to have occupied the bathhouse without obtaining a certificate of occupancy would affect the parties' legal interests when the bathhouse no longer exists. Certainly, if the bathhouse still stood, a declaratory judgment would affect the parties' legal interests; it would necessarily require Covenant Life to seek the necessary certificate of occupancy, or else be in present violation of the

18

zoning ordinance through its continued use of the bathhouse. With the bathhouse razed, however, a declaratory judgment regarding the lack of a certificate of occupancy is of no import and does not alter the parties' legal interests.[6]

Norris argues that its bathhouse claims should not be rendered moot because Covenant Life failed to obtain a permit before demolishing the bathhouse, in violation of International Building Code § 105.1. [Doc. 29 at 11]. The Court can understand Norris's frustration with this clear violation of its regulations, but the violation has no bearing on whether the underlying claim is moot. Norris's claim that Covenant Life failed to obtain a certificate of occupancy for the bathhouse can still be moot, even if Covenant Life demolished the bathhouse without a permit. It is the act of demolishing the bathhouse alone that renders the claim moot.[7] For these reasons, the certificate of occupancy claim, insofar as it pertains to the bathhouse, is moot.

As to the remainder of the Retreat, excluding the now-demolished bathhouse, the zoning ordinance's plain language dictates that a certificate of occupancy was required. Section 14-604 of Norris's zoning ordinance states as follows:

> No land or building or other structure or part thereof hereafter erected, moved, or altered in its use shall be used until the Building Inspector shall have issued a certificate of occupancy stating that such land, structure, or part thereof is found to be in conformity with the provisions of the zoning ordinance.

Norris Zoning Ordinance § 14-604. The record plainly reflects that Covenant Life's land was "altered in its use" as to render a certificate of occupancy required. Covenant Life again argues that the Retreat qualifies as church and parking uses, and Norris had previously approved those

---

[6] Norris also alleges that Covenant Life failed to obtain proper permitting for the bathhouse. [Doc. 19 at 15]. The same rationale for mooting the certificate of occupancy claim applies to the permitting claims. Again, it is difficult to see how a declaratory judgment deeming the bathhouse to have been built without proper permitting affects the parties' legal interests when the bathhouse no longer exists.

[7] Of note, Norris did not amend its counterclaim to include any allegations regarding the bathhouse's unpermitted demolition. [*See* Doc. 8].

19

uses on the property. [Doc. 27 at 21, 23]. The Court already rejected these arguments, however, and deemed the Retreat to be neither a church nor parking. The Retreat portion of the property transformed from a seemingly undeveloped area into one with sixteen parking slips, individualized utility hookups, and overnight guests. To say that this transformation does not constitute an alteration in use is to ignore the facts.[8] Because the Retreat altered the use of the church property, Covenant Life was required to obtain a certificate of occupancy. Its failure to do so means that Norris is entitled to summary judgment on this claim.

### 3. Site Plan and Permitting

Norris also asks the Court to enter a declaratory judgment finding that Covenant Life developed the Retreat without providing an updated site plan or obtaining the required building, grading, electrical, or plumbing permits. The Court will address the site plan issue and each permitting issue separately.

### a. Site Plan

Norris is not entitled to summary judgment on its claim challenging Covenant Life's failure to submit a site plan. According to Norris, Section 14-418 of its zoning ordinance requires Covenant Life to submit a site plan for the Retreat. Section 14-418 provides that "[a]ll persons, businesses, or organizations applying for a building permit must first submit eight (8) copies of a site plan for all commercial, multi-family and industrial developments." [Doc. 18-4 at 99]. From the section's plain language, the requirement to submit a site plan is triggered only when one applies for a building permit. Norris does not suggest that Covenant Life applied for any building

---

[8] The Court recognizes that it did not grant summary judgment on Norris's claim that the Retreat is a prohibited use in the P-1 District. That being said, whether land is "altered in its use" for purposes of a certificate of occupancy and whether a use is permitted in a particular zoning district are separate issues. Based on Section 14-604's plain language, a certificate of occupancy could still be required even if a new use on property is permitted under the zoning ordinance but nevertheless results in the land being "altered in its use." For example, educational facilities are a permitted use in P-1 Districts, but if a church in a P-1 District decided to build a school building on its property, a certificate of occupancy would certainly be required, despite the school building being a permitted use.

20

permits. To the contrary, a central theme of Norris's case is that Covenant Life failed to apply for any of the necessary permits. [Doc. 19 at 2]. Because the parties agree that Covenant Life did not apply for building permits, the requirement to submit site plans did not become ripe.

Norris's site plan claim does not warrant summary judgment for an additional reason. Once again looking to Section 14-418's plain language, site plans must be submitted for commercial, multi-family, and industrial developments. [Doc. 18-4 at 99]. The Retreat is clearly not a multi-family or industrial development, and the Court already denied summary judgment as to Norris's characterization of the Retreat as a commercial use. Covenant Life is correct to point out that Norris has failed to demonstrate the Retreat's inclusion within any of these categories as to render a site plan required.

Apparently recognizing this flaw in its argument, Norris cites to the International Building Code in its reply brief in further support its site plan claim. [Doc. 29 at 9]. Norris invokes International Building Code § 107.2.5, which dictates that "[t]he construction documents submitted with the application for permit shall be accompanied by a site plan." [Doc. 18-2 at 7 (italics removed)]. Similar to Section 14-418 of Norris's zoning ordinance, this section's language only requires site plans to be submitted in conjunction with a permit application, and Norris does not suggest Covenant Life applied for any building permits. The lack of any building permit application renders International Building Code § 107.2.5 inapplicable.

Norris's final argument on its site plan claim emphasizes that Covenant Life's on-file site plan from 2007 does not accurately reflect the current state of the property. Norris contends that the 2007 site plan does not show the park, installed utilities, and other features of the property as it exists today. [Doc. 29 at 9]. This contention is correct, as the site plan does not include any depictions of the Retreat or its effect on the property. [Doc. 18-14]. Nevertheless, Norris does not

21

point to any provision in its zoning ordinance or the International Building Code that imposes a standalone requirement for an updated site plan to be on file at all times. Norris only invokes provisions requiring site plans to be submitted in connection with permit applications.[9] With Covenant Life having not applied for any building permits, the Court cannot grant summary judgment to Norris on its site plan claim.

### b. Building Permits

Norris takes issue with Covenant Life's failure to obtain building permits for the bathhouse or the Retreat in general. As to the bathhouse, this claim is moot for the same reasons the bathhouse claim pertaining to the certificate of occupancy was deemed moot. Norris's claim as to the rest of the Retreat is not moot, however. Norris asserts that pursuant to International Building Code § 105, Covenant Life needed to obtain a building permit for its development of the Retreat. Covenant Life disagrees and suggests the placement of gravel, sod, and picnic tables at the Retreat does not fall within Section 105's scope. The Court agrees with Covenant Life, and Norris is not entitled to summary judgment on this aspect of its claim.[10]

International Building Code § 105.1 requires anyone "who intends to construct, enlarge, alter, repair, remove, demolish or change the occupancy of a building or structure" to first obtain a permit. [Doc. 18-2 at 5 (italics removed)]. In his sworn declaration, McAfee avers that to create the Retreat, Covenant Life merely spread gravel for the driveways and spaces, installed sod between the spaces, and placed picnic tables on the grass-covered areas. [Doc. 27-1 at ¶ 22]. Covenant Life stresses that none of these items—the gravel, sod, or picnic tables—are buildings

---

[9] As Norris emphasizes, International Building Code § 107.2.5 does require a site plan to show all existing structures on the property and any proposed new construction. [Doc. 29 at 9]. Again, however, these details need only be provided when one applies for a permit and submits the required site plan. Section 107.2.5's language does not obligate property owners to keep an updated site plan on file at all times.

[10] In this section, the Court is only addressing the Retreat's gravel, sod, and picnic tables. The Court will consider the Retreat's utility hookups, and Norris's argument that permits were needed for them, separately in a later section.

22

or structures for which a permit is required under Section 105. [Doc. 27 at 18–19]. Norris does not argue to the contrary in its reply brief. It instead pivots to a discussion of the Retreat's electrical and plumbing hookups, which the Court will address later. [Doc. 29 at 10]. As it is apparent that the gravel, sod, and picnic tables do not qualify as buildings or structures, they do not fall within Section 105's purview and did not require a permit. Norris's request for summary judgment as to this particular claim is denied.

### c. Grading Permits

Closely related to the building permit claim is Norris's challenge to Covenant Life's failure to obtain grading permits before developing the bathhouse or the Retreat. To support its claim, Norris cites two provisions of its zoning ordinance, Sections 14-416 and 14-603. [Doc. 19 at 17]. Both sections, using similar language, require permits to be obtained before commencing any grading or excavation work. [Doc. 18-4 at 96, 111]. As with the certificate of occupancy and building permit claims, Norris's claim regarding the bathhouse is moot. That leaves the rest of the Retreat. Because a factual dispute remains as to whether any grading activity occurred, Norris's request for summary judgment is denied.

Covenant Life, through McAfee's declaration, claims that creation of the Retreat parking area did not involve any grading or excavation work. [Doc. 27-1 at ¶ 22–23]. The Retreat's development merely entailed spreading gravel and installing sod. [*Id.*]. David Lee, who oversaw the Retreat's development, offers the same account in his declaration. [Doc. 27-2 at ¶ 5, 8–9]. Norris challenges these assertions and argues that some land disturbance activity was necessarily required to install the underground utilities now servicing the Retreat. [Doc. 29 at 11]. Norris submits an affidavit of City Manager Charles Ledford, who avers that the Retreat includes

unpermitted, underground utility hookups at each parking slip. [Doc. 30 at ¶ 2–3].[11] These affidavits offer competing accounts of the Retreat's development. McAfee and Lee's suggest that no grading or excavating activity occurred while Ledford's indicates the opposite.

The Court cannot make credibility determinations or weigh the evidence when ruling on a motion for summary judgment. *Anderson*, 477 U.S. at 256. To be sure, the Court doubts that no land disturbing activity occurred in connection with the Retreat's development, particularly when considering the utility hookups available at each parking slip. The Court's skepticism, however, provides no reason to grant summary judgment. The existence of a factual dispute requires the Court to deny summary judgment on this claim.

### d. Electrical Permits

Norris relies on Sections 105.1 and 112.1 of the International Building Code to support its claim that Covenant Life needed to obtain a building permit before installing underground electrical hookups at the Retreat. [Doc. 19 at 15; Doc. 29 at 10]. Section 105.1 mandates a building permit for anyone who plans to "install . . . any electrical, gas, mechanical or plumbing system, the installation of which is regulated by this code." [Doc. 18-2 at 5]. Section 105.1's permitting requirement is plainly conditioned on the electrical system's installation being "regulated by this code." [*Id.*]. The important question, then, is what does the International Building Code regulate? Covenant Life cites to Section 101.2 to answer this question. [Doc. 34 at 4]. This section clarifies that the International Building Code's provisions "shall apply to the construction . . . of every

---

[11] Norris attached Ledford's affidavit as an exhibit to its reply brief. The Court may consider reply affidavits when they respond to arguments made in the opposing party's response brief. *Key v. Shelby Cnty.*, 551 F. App'x 262, 264 (6th Cir. 2014) (citing *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 476 (6th Cir. 2002)). Norris claimed in its opening brief that Covenant Life failed to obtain any grading permits. [Doc. 19 at 17]. In its response, Covenant Life argued that permits were not necessary because it did not perform any grading work. [Doc. 27 at 19]. Ledford's reply affidavit, in asserting that underground utility hookups exist at the Retreat, responds to and tends to refute Covenant Life's claim in its response brief that no grading or excavation work was performed. For this reason, the Court may consider Ledford's reply affidavit. *Key*, 551 F. App'x at 264 (citing *Peters*, 285 F.3d at 476).

24

building or structure or any appurtenances connected or attached to such buildings or structures." [Doc. 18-2 at 2]. Covenant Life offers a declaration of Ray Hagan, an electrical contractor who helped install the electrical hookups at the Retreat. [Doc. 34-1].[12] Hagan avers that the Retreat's electrical hookups are not connected or attached to any building or structure. [*Id.* at ¶ 6]. If true, this could remove the electrical hookups from the scope of the International Building Code, which only regulates structures or attachments to structures. [Doc. 18-2 at 2].

In response, Norris emphasizes that permanent fixtures house the Retreat's electrical hookups. [Doc. 35 at 3]. Photographic evidence suggests the hookups do exist in fixture form, as Norris contends. [Doc. 30-3]. Presumably, Norris is arguing that the hookups, as permanent fixtures, qualify as structures, which would bring them within the scope of the International Building Code's regulation. This argument may have merit, but the excerpts of the International Building Code Norris submits do not include any definition for "structure." Without the benefit of this definition, the Court cannot say for purposes of summary judgment whether the electrical hookups existing as fixtures renders them structures subject to the International Building Code's regulation. This lack of information, along with Hagan's declaration regarding the hookups not being connected to any building or structure, renders summary judgment inappropriate as to Norris's claim under Section 105.1.

Norris also cites to International Building Code § 112.1 to support its claim that Covenant Life needed building permits for the electrical hookups. [Doc. 19 at 15; Doc. 29 at 10]. Section 112.1 requires a permit to be obtained for any "connections from a utility . . . to any building or system that is regulated by this code for which a permit is required." [Doc. 18-2 at 10 (italics

---

[12] The Court granted leave to Covenant Life to file a sur-reply, provided it was limited to the scope of Norris's reply brief. [Doc. 33 at 3]. Covenant Life attached Hagan's declaration as an exhibit to its sur-reply. [Doc. 34-1]. The Court can consider Hagan's declaration because it responds directly to contentions Norris made in its reply brief regarding the need for permitting for the electrical hookups. *Key*, 551 F. App'x at 264 (citing *Peters*, 285 F.3d at 476).

removed)]. Norris points out that Covenant Life does not address Section 112.1's permitting requirement. [Doc. 35 at 3]. True, Covenant Life does not specifically refer to Section 112.1 by number, but it does broadly argue that the International Building Code does not regulate electrical hookups not connected to any building or structure. [Doc. 34 at 4]. This argument can apply with equal force to Section 112.1, which like Section 105.1, includes the "regulated by this code" language. Again, Hagan avers that the electrical hookups are not connected to any building or structure. [Doc. 34-1 at ¶ 6]. This declaration, if believed, would appear to make Section 112.1 inapplicable; there would be no "connections from a utility," in this case the electrical hookups, to any building or system regulated by the code. [Doc. 18-2 at 10]. Considering Section 112.1's language and Hagan's declaration, Norris's is not entitled to summary judgment.

Norris last cites to Section 14-603 of the zoning ordinance to support its electrical permitting claim. [Doc. 29 at 10].[13] But Norris's first mention of this provision comes with a passing reference in its reply brief. [*Id.*]. Whereas Norris mentions International Building Code Sections 105.1 and 112.1 in its opening brief, it only refers to Section 14-603 in the context of grading permits and does not tie it in with the Retreat's electrical hookups or utility connections. [Doc. 19 at 17]. The Court will not consider Section 14-603's impact on this claim for purposes of Norris's motion for summary judgment.

Even if the Court did consider Section 14-603 in assessing Norris's claim, it is unlikely that the section would justify granting summary judgment. Covenant Life, through Hagan's declaration, indicates that Norris does not issue electrical permits, and permits for the Retreat's electrical hookups were obtained separately through the Tennessee Department of Commerce and

---

[13] Norris specifically refers to Section 14-602, but that section only deals with the building inspector's enforcement responsibilities. [Doc. 18-4 at 271]. The Court assumes that Norris meant to invoke Section 14-603, which deals with building permit requirements. [*Id.*].

Insurance after inspection and approval. [Doc. 34-1 at ¶ 3–4]. Tennessee law does establish a regime whereby the Tennessee Department of Commerce and Insurance oversees and performs electrical inspection services. *See* TENN. CODE. ANN. § 68-102-143. Norris argues that obtaining permitting through the State of Tennessee does not excuse Covenant Life from also obtaining permitting from the City. [Doc. 35 at 3]. Norris does not cite to any authority to support this proposition, and the parties do not offer any more discussion as to the interplay between the State of Tennessee's permitting regime and that of the City's. Given this unresolved issue and Hagan's assertion that Norris does not issue electrical permits, summary judgment would likely be inappropriate under Section 14-603 even if the Court considered its applicability to Norris's electrical permitting claim.

### e. Plumbing Permits and Circumvention

Norris seeks a declaration that Covenant Life is circumventing a now-lifted stop work order through its use of a garden hose to supply water to the Retreat. [Doc. 19 at 16–17]. Covenant Life previously connected an underground water pipe from the church building to the Retreat. That act led Norris to issue a stop work order for the unpermitted installation, alteration, and enlargement of a plumbing system. After Covenant Life disconnected the water line, Norris released the stop work order. Subsequently, however, Covenant Life connected a garden hose to a spigot at the church building to supply water to the Retreat. Norris characterizes this action as a circumvention of the stop work order, in violation of Section 18-106 of the Norris Municipal Code. Section 18-106 forbids anyone from obtaining "water from the municipal water system of the City of Norris in any way or manner which would circumvent or violate any of the requirements, rules, regulations, etc., of the City of Norris." [Doc. 18-1 at 11].

27

Norris asserts that Covenant Life is circumventing two provisions, International Building Code § 112 and International Plumbing Code § 106.[14] International Building Code § 112, as the Court has explained, requires one to obtain a permit before he "make[s] connections from a utility . . . to any building or system that is regulated by this code." [Doc. 18-2 at 10]. For relief to be proper under Section 112, the garden hose must, at a minimum, travel to a building or system regulated by the code. [*Id.*]. The parties offer competing accounts as to where the garden hose travels. Covenant Life contends that it runs from the spigot to individual recreational vehicles at the Retreat. [Doc. 27 at 17]. This account would render Section 112 inapplicable because in traveling to individual recreational vehicles, the garden hose would not be connected to any buildings or systems regulated by the code. [*Id.*].

On the other hand, Norris asserts that the garden hose runs from the spigot to a separately installed plumbing system at the Retreat. [Doc. 29 at 13]. Norris's description could change the outcome. If the garden hose in fact travels to a separately installed plumbing system, that system could qualify as one regulated by the code and form the basis of a Section 112 violation. Considering the factual dispute regarding where the garden hose runs, however, the Court cannot grant summary judgment to Norris on this aspect of its circumvention claim.

Though not entitled to summary judgment under Section 112, the result is different under International Plumbing Code § 106 and International Building Code § 105. Those sections require a permit to "erect, install, enlarge, alter, repair, remove, convert or replace any plumbing system, the installation of which is regulated by this code." [Doc. 18-3 at 4]. Covenant Life stresses that

---

[14] Covenant Life mentions that Norris cites to International Plumbing Code § 106 to support its circumvention argument, even though the provision is not referenced in the stop work order. [Doc. 27 at 17]. True, the stop work order invokes International Building Code § 105 rather than International Plumbing Code § 106. [Doc. 18-9]. But those sections are materially identical to one another. [*Compare* Doc. 18-2 at 5, *with* Doc. 18-3 at 4]. Both sections impose a permitting requirement for any installation, enlargement, or alteration of a plumbing system. [*Id.*]. Thus, the analysis is the same under International Plumbing Code § 106 and International Building Code § 105.

the spigot is part of the church building's plumbing system, which Norris issued permits for years ago. [Doc. 27 at 17]. Because the church building's plumbing system required permit approval, it is clearly regulated by the International Plumbing and Building Codes. Covenant Life does not argue to the contrary. International Plumbing Code § 106's plain language requires permit approval to "enlarge" or "alter" the church building's regulated plumbing system.

In using the garden hose to provide water to the Retreat, Covenant Life is, at the very least, "enlarging" or "altering" the church building's plumbing system. This is true regardless of whether the garden hose is traveling to individual recreational vehicles or to a separately installed plumbing system at the Retreat. Covenant Life's use of the garden hose provides a continuous water source from the church building to a separate location on the property. As Norris mentions, this use of the garden hose accomplishes the same result as if Covenant Life had relied on an underground pipe running water from the church to the Retreat. [Doc. 29 at 13–14].[15] Covenant Life's use of the garden hose, along with its failure to obtain the necessary permit for that use, constitutes a circumvention of the stop work order. Norris is entitled to summary judgment on this claim.

### f. Sewer Permitting

Norris's final claim contests Covenant Life's failure to obtain permits for the sewer and wastewater discharge utilities it installed at each parking slip. [Doc. 29 at 10 n.2]. Norris waived this claim for purposes of this motion, however, because parties cannot raise arguments for the first time in reply briefs. *Select Specialty Hosp.-Memphis, Inc. v. Trs. of Langston Cos.*, No. 2:19-cv-2654, 2020 WL 4275264, at *9 (W.D. Tenn. July 24, 2020) (citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008)). Norris's opening brief never uses the terms "sewer"

---

[15] Covenant Life chastises Norris for arguing that the International Plumbing Code requires a permit before one may connect a garden hose to a spigot. [Doc. 27 at 18]. But that is not what Norris argues. Rather, Norris takes issue with the garden hose being used as a mechanism to expand a plumbing system.

or "wastewater." [*See generally* Doc. 19]. Though the brief details how Covenant Life failed to obtain plumbing permits, those discussions pertain to the unpermitted water line from the church building to the Retreat, not to any sewer and discharge utilities at the individual parking slips. [*Id.* at 7–8, 16–17]. The plumbing connection from the church building to the Retreat and the sewer hookups at the individual parking slips are separate issues.

In its reply brief, Norris states that "Covenant Life installed electrical and plumbing systems" at the Retreat. [Doc. 29 at 10]. It accompanies that same sentence with a footnote stating "[t]he RV slips *also* apparently have sewer/wastewater discharge utilities." [*Id.* at 10 n.2 (emphasis added)]. The use of "also" strongly suggests even Norris views the sewer hookups as separate from its allegations regarding the plumbing system and water lines generally. Semantics aside, Norris does not discuss the individual sewer and wastewater discharge utilities in its opening brief. That omission is sufficient to deem the issue waived for purposes of this motion. For this reason, the Court cannot grant summary judgment to Norris on any claim regarding unpermitted sewer and wastewater discharge utilities.

## C.  Norris's Motion for Preliminary Injunction

In addition to requesting summary judgment on its declaratory judgment counterclaim, Norris seeks preliminary and permanent injunctive relief barring Covenant Life from continued use of the Retreat. [Doc. 19 at 2]. Each factor guiding the injunctive relief inquiry weighs in Norris's favor. Accordingly, the Court will grant Norris's request for preliminary and permanent injunctive relief on the terms set forth below.

### 1.  Likelihood of Success on the Merits

In determining the propriety of injunctive relief, courts first consider "whether the movant has a 'strong' likelihood of success on the merits." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th

30

Cir. 2000) (citations omitted). The movant must show "more than a mere possibility of success" to meet this burden. *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citing *Mason Cnty. Med. Ass'n v. Knebel*, 563 F.2d 256, 261 n.4 (6th Cir. 1977)). Norris has not merely shown a likelihood of success on the merits. It has *already* succeeded on the merits. The Court granted summary judgment to Norris on multiple aspects of its declaratory judgment counterclaim. Specifically, the Court ruled in Norris's favor on its claims that Covenant Life began using the Retreat without a certificate of occupancy and circumvented a stop work order through its unpermitted enlargement or alteration of the church building's plumbing system. This factor quite clearly supports the request for injunctive relief.

### 2. Irreparable Harm

The second factor considers whether the movant would suffer irreparable harm absent injunctive relief. *Leary*, 228 F.3d at 736 (citations omitted). An irreparable injury is one "not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)). The irreparable harm requirement is "indispensable" even with a remarkably strong showing on the other three factors. *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019) (citing *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 103, 105 (6th Cir. 1982)).

Norris advances two arguments on the irreparable harm factor. First, Norris cites to a decision in this district which expressed, while citing to a Ninth Circuit case, that governmental entities need not show irreparable harm in statutory enforcement actions. *Tenn. ex rel. Skrmetti v. Ideal Horizon Benefits, LLC*, No. 3:23-cv-46, 2023 WL 2299570, at *2 (E.D. Tenn. Feb. 28, 2023) (citing *FTC v. Consumer Def., LLC*, 926 F.3d 1208, 1212 (9th Cir. 2019)). Norris argues that because it seeks to enforce its ordinances, it is not required to demonstrate irreparable harm. [Doc.

19 at 20]. The Court is not aware of any Sixth Circuit case that firmly echoes the Ninth Circuit's sentiment.[16] Moreover, the Ninth Circuit's decision interpreted the FTC Act, which the court found had eliminated the irreparable harm requirement by its text. *Consumer Def., LLC*, 926 F.3d at 1212. The provision under which Norris seeks injunctive relief does not purport to reduce the required showing to obtain injunctive relief. [Doc. 18-4 at 116]. In any event, the Court is reluctant to dispense of the irreparable harm requirement, especially when case law routinely deems it indispensable. *D.T.*, 942 F.3d at 327 (citing *Friendship Materials, Inc.*, 679 F.2d at 103).

Norris's second and more persuasive argument is that Covenant Life's violations of city ordinances and stop work orders result in irreparable harm. [Doc. 19 at 20–21]. Covenant Life's only argument on this point is that Norris cannot demonstrate irreparable harm because no ordinances have been violated. [Doc. 27 at 24]. Of course, the Court already found multiple ordinance violations, and the Court agrees with Norris that the violations cause irreparable harm. Monetary damages simply cannot compensate for Covenant Life's wrongful failure to obtain a certificate of occupancy or acquire permits for its use of the garden hose. As Norris highlights, its zoning ordinance exists to safeguard "the public health, safety, convenience, order, prosperity, and general welfare of the community." [Doc. 18-4 at 9]. Certificate of occupancy and permitting requirements help to achieve these goals; they ensure properties are safe and suitable for human habitation. Covenant Life's non-compliance with these requirements prevents Norris from verifying the property's safety and protecting members of its community. This resulting harm is very much irreparable.

---

[16] In *United States v. Edward Rose & Sons*, the plaintiff sought injunctive relief under the Fair Housing Act, which provides that courts "may award" an injunction for violations of the statute. 384 F.3d 258, 264 (6th Cir. 2004). The Sixth Circuit declined to decide whether a statute's mere authorization of injunctive relief eliminates the irreparable harm requirement or "whether a statute must mandate another showing that displaces the traditional equitable factors" to do so. *Id.*

### 3. Balance of the Equities

Even upon demonstrating likely success on the merits and irreparable harm, the movant must show "the balance of equities tips in his favor" before a court may issue an injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008) (citations omitted). This factor requires the Court to weigh the harm to the movant if injunctive relief is denied against the harm others would suffer if an injunction took effect. *United Food & Com. Workers Union, Loc. 1099 v. S.W. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 363 (6th Cir. 1998). Covenant Life argues that it will suffer harm from an injunction as will the Retreat's guests. [Doc. 27 at 24–25]. The Court concludes that these harms do not outweigh the irreparable harm Norris endures from the lack of compliance with its zoning ordinances.

Covenant Life explains that an injunction would cause it harm through a reduction in charitable donations and loss of First Amendment rights. [*Id.*]. Covenant Life could lose out on charitable donations following an injunction against the Retreat's continued operation. These monetary losses, however, do not justify a denial of injunctive relief. The Sixth Circuit rejected a similar argument in *United States v. Edward Rose & Sons*. 384 F.3d at 264. In that case, the government sought to enjoin a builder's construction of apartment complexes due to Fair Housing Act violations. *Id.* at 260–61. The builder argued against the injunction because the halt in construction was costing $150,000 per month. *Id.* at 264. Rejecting that argument, the Sixth Circuit deemed the monetary injuries the builder incurred to be insufficient. *Id.* Moreover, the government had previously warned the builder of the Fair Housing Act violations, so the builder "voluntarily incurred any harm from the preliminary injunction" upon continuing construction. *Id.*

Covenant Life's potentially diminished donations do not tip the equities against Norris. As in *Edward Rose & Sons*, where the builder continued construction despite being warned of

statutory violations, Covenant Life continued to operate the Retreat as is notwithstanding Norris's stop work orders identifying various code violations. Norris advised Covenant Life of the need for a certificate of occupancy and permits for its provision of water to the Retreat, but Covenant Life did not heed the warnings. Both Covenant Life and the builder in *Edward Rose & Sons* proceeded at their own risk and "voluntarily incurred any harm from the preliminary injunction." *Id.*

Covenant Life's alleged loss of First Amendment rights affords it no basis for relief. This case is not about Covenant Life's First Amendment rights. Instead, this case concerns whether Covenant Life's Retreat conforms with Norris's ordinances. The Court has already found that it does not conform, and the First Amendment does not immunize Covenant Life from the application of zoning laws and building codes. An injunction against the Retreat's continued operation may well prevent interactions between church members and guests. But the injunction arises from Covenant Life's failure to comply with Norris's ordinances, not because of its speech-related activities at the Retreat. Were Covenant Life's position allowed to stand, any zoning-related enforcement action could be defeated simply after the property owner cries interference with his First Amendment rights.

Potential harm to Covenant Life does not end the inquiry. In balancing the equities, the Court may also consider the harm an injunction would inflict on third-parties. *Posey v. Garland*, No. 1:23-cv-51, 2023 WL 5435609, at *10 (E.D. Tenn. Aug. 23, 2023) (citation omitted). The obvious third-parties at issue here are the Retreat's current guests. In halting the Retreat's continued operation, an injunction would certainly cause harm to current guests. They would be required to relocate. The Court sympathizes with these individuals, but the harms to them are nevertheless insufficient to support a denial of injunctive relief. For one, the remaining factors each point towards granting injunctive relief. *Ohio v. Becerra*, 87 F.4th 759, 783 (6th Cir. 2023)

Case 3:23-cv-00334-CEA-JEM    Document 46    Filed 05/01/24    Page 34 of 38    PageID #: 695

(finding the balance of equities supported a preliminary injunction where majority of the other factors also supported a preliminary injunction). Additionally, the harm inflicted on the guests does not outweigh the irreparable harm from which Norris suffers. Without a certificate of occupancy or necessary permits, Norris cannot ensure the Retreat's safety. This harm to Norris could pose the greatest risk to Retreat guests. If any aspect of the Retreat turned out unsafe, guests would be those most likely to experience harm from the danger posed. Despite the harms an injunction could inflict on Retreat guests and Covenant Life as a whole, the Court concludes that the equities support granting injunctive relief to Norris.

### 4. Public Interest

The final preliminary injunction factor requires the Court to consider whether issuing the requested injunction would serve the public interest. *Leary*, 228 F.3d at 736 (quoting *McPherson*, 119 F.3d at 459). In assessing this factor, courts treat the government's interest and the public interest as one and the same. *R.K. v. Lee*, 563 F. Supp. 3d 774, 786 (M.D. Tenn. 2021) (citations omitted). Even Covenant Life acknowledges Norris's interest in enforcing its laws. [Doc. 27 at 25]. And the proper enforcement of laws unquestionably serves the public interest. Proper enforcement of land use laws helps to ensure that all properties are safe for occupation and all property owners are subject to the same restrictions. The public interest favors injunctive relief.

### 5. Security Requirement

Having deemed injunctive relief proper, the Court must decide whether to require Norris to post security. Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Notwithstanding the rule's apparently mandatory language,

the Sixth Circuit affords district courts discretion over whether to require the posting of security or not. *Moltan Co. v. Eagle-Pitcher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (citations omitted); *see also RECO Equip., Inc. v. Wilson*, No. 20-4312, 2021 WL 5013816, at *5 (6th Cir. Oct. 28, 2021) (explaining that "a lower court can expressly choose not to require security" despite Rule 65(c)'s language).

Norris asks the Court to exercise its discretion and waive the security requirement. [Doc. 19 at 23]. Meanwhile, Covenant Life requests a significant security requirement before enjoining what it describes as lawful conduct. [Doc. 27 at 25]. The Court already concluded that Covenant Life violated Norris's municipal ordinances in multiple ways. Considering Covenant Life's wrongful conduct, the Court will not require Norris to post any security.

### 6. Terms of the Injunction

All injunctions "must be couched in specific and unambiguous terms." *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 362 (6th Cir. 2022) (citations omitted). This directive stems from Federal Rule of Civil Procedure 65(d), which requires all orders granting injunctions to "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail— and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d). The Court will lay out the injunction's terms below.

At the outset, Norris requests both preliminary and permanent injunctive relief. [Doc. 19 at 19 n.6]. The factors governing a preliminary injunction analysis and permanent injunction analysis are substantially similar. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Specifically, a party requesting a permanent injunction must show: (1) that it suffered irreparable harm; (2) that legal remedies fail to compensate for the injury; (3) that a balance of the equities supports injunctive relief; and (4) that the public interest favors a permanent injunction. *Id.*

(citations omitted). The Court already found that Norris satisfied these factors when assessing the propriety of a preliminary injunction. Norris is therefore entitled to both a preliminary and permanent injunction.

Considering the foregoing, Covenant Life is **PERMANENTLY ENJOINED** from the following conduct: (1) operating the Retreat without a certificate of occupancy; and (2) supplying water to the Retreat from the garden hose in circumvention of the now-lifted stop work order and without a plumbing permit. The terms of this injunction shall take effect **30 days** from the entry of this Order. If Covenant Life fails to obtain a certificate of occupancy and fails to obtain the required permit for its use of the garden hose within **30 days** from the entry of this Order, Covenant Life **SHALL** cease operation of the Retreat, and all guests **SHALL** vacate the premises.

## IV.    CONCLUSION

Norris's Motion for Preliminary Injunction and Motion for Summary Judgment. [Doc. 17] is **GRANTED IN PART** and **DENIED IN PART**. Regarding Norris's request for a preliminary injunction, an injunction is issued on the terms just set forth above. The Court's rulings on Norris's request for summary judgment on its declaratory judgment counterclaim are summarized below:

- Norris's request for summary judgment is **DENIED** as to its claim that the Retreat is not a permitted use within the P-1 District.

- Norris's request for summary judgment is **GRANTED** as to its claim that Covenant Life is wrongfully operating the Retreat without the required certificate of occupancy.

- Norris's request for summary judgment is **DENIED** as to its claim that Covenant Life unlawfully failed to submit a site plan in connection with the Retreat's development.

- Norris's request for summary judgment is **DENIED** as to its claim that Covenant Life wrongfully failed to obtain a building permit for the Retreat parking area.

37

- Norris's request for summary judgment is **DENIED** as to its claim that Covenant Life wrongfully developed the Retreat without obtaining the required grading permits.

- Norris's request for summary judgment is **DENIED** as to its claim that Covenant Life wrongfully installed electrical utilities without obtaining the required building permits.

- Norris's request for summary judgment is **GRANTED** as to its claims that Covenant Life circumvented a stop-work order through its use of the garden hose and wrongfully failed to obtain the required permit for that use.

- Norris's request for summary judgment is **WAIVED** for purposes of this motion as to its claim that Covenant Life wrongfully installed sewer utilities without obtaining the required permits.

- All claims pertaining to the bathhouse, including that its use wrongfully commenced without a certificate of occupancy or the proper permits, are **DISMISSED AS MOOT**.

**SO ORDERED.**

*/s/ Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**